**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Dewayne Outley, Jr., | No.  CV 18-02753-PHX-GMS (JFM) |
| Plaintiff, | |
| v. | **ORDER** |
| Paul Penzone, et al., | |
| Defendants. | |

Plaintiff Michael Dewayne Outley, Jr., who is currently confined in a Maricopa County Jail, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") against Defendant Maricopa County Sheriff Paul Penzone, Detention Captain Jesse Spurgin, and Unknown Vail.  (Doc. 82.) Pending before the Court is Defendant Penzone's Motion for Summary Judgment. (Doc. 119.)[1]

Also pending before the Court are Plaintiff's "Motion for Preliminary Injunction & or Declaratory Judgment In Lieu of & Request for Leave to Add Pages & All Attached Exhibits Per LRCiv. 7.2(e)" (Doc. 118), Plaintiff's "Motion for Leave to Have His Investigator Lodge Photos of His Cell & to Request Order Issue to Enjoin MCSO from Interfering in Plaintiff's Criminal & Federal Suits" (Doc. 135), which the Court construes as a motion for preliminary injunction, and Defendant Penzone's Motion to Strike (Doc. 143).  Plaintiff also filed a "Stipulated Motion to Withdraw Defendant's Captain's Jesse

---

[1]  The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Doc. 121.)

Spurgin and Scott Vail" (Doc. 176), which the Court construes as a stipulated motion to dismiss the claims against Defendants Vail and Spurgin.

The Court will grant in part and deny in part the Motion for Summary Judgment, deny the motions for injunctive relief, and deny Defendant Penzone's Motion to Strike as moot. The stipulated motion to dismiss will also be granted.

## I.    Background

On screening of Plaintiff's Second Amended Complaint (Doc. 82) under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a First Amendment and a RLUIPA claim in Count One against Defendant Penzone, in his official capacity, regarding the use of surveillance cameras to record prisoner showers and a First Amendment claim in Count Two against Defendants Penzone, Vail and Spurgin regarding Maricopa County Sheriff's Office (MCSO) policies limiting prisoners' incoming mail to metered 4 x 6 inch postcards and only allowing prisoners to possess 5 photos at a time.  (Doc. 83.)  The Court directed those Defendants to answer the claims against them.  (*Id.*)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Facts[2]

### A. Facts Relating to Showers

Plaintiff is a pretrial detainee in the custody of the MCSO since January 26, 2018. (DSOF ¶ 1; Pl. Decl. ¶ 6.) Plaintiff is a Muslim and there are 5 pillars of Islam that all Muslims must follow. (Pl. Decl. ¶ 2.) Plaintiff prays 5 times a day, practices charity, observes Ramadan, and can counsel with spiritual leaders. (DSOF ¶¶ 2-3.) As a believer of Islam, it is "a nudity taboo to be viewed by others while nude or while showering or bathing," except for a dire emergency or when Plaintiff is with his "spouse/significant other." (Pl. Decl. ¶¶ 4-5.)

---

[2] The relevant facts are primarily taken from Defendant's Statement of Facts (Doc. 120) ("DSOF") and Plaintiff's Declaration (Doc. 137 at 20-28) ("Pl. Decl."). While Plaintiff did file a Separate Statement of Facts and Controverting Statement of Facts, they are often argumentative and pose rhetorical questions. Moreover, in his Controverting Statement of Facts, Plaintiff often says he both agrees and disputes a specific fact, but does not specify what part of Defendant's fact he agrees with and what part he disputes, which would require the Court to guess at Plaintiff's intent. Therefore, in the interest of presenting Plaintiff's position as completely as possible, the Court will also refer to Plaintiff's Second Amended Complaint (Doc. 82) for additional facts that are not set forth in his Declaration or exhibits. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence).

Assaults and sexual assaults occur in the jail setting; blind spots and unmonitored spaces are safety hazards because that is where assaults and criminal activity can occur. (DSOF ¶¶ 5-6.)  Surveillance cameras are used at the MCSO's Fourth Avenue Jail to eliminate blind spots, deter prohibited behavior, and provide a video record for investigating accidents or criminal acts.  (*Id.* ¶ 7.)

MCSO uses fixed-view cameras to monitor (i.e., record) shower areas in the General Population (GP).  (*Id.* ¶ 8.)  Live footage from those cameras "is inaccessible from the Tower." (*Id.* ¶ 9.)  Prisoners in the GP may shower at any time during their time out.  (*Id.* ¶ 12.)  Prisoners housed in the Special Management Unit ("SMU") shower inside their cells; surveillance cameras do not record inside cells in SMU.  (*Id.* ¶¶ 13-14.)  Prisoners in Closed Custody ("CC") units 4B and 4E are escorted to a shower area one at a time and locked inside the shower area; surveillance cameras are not used in the shower areas of 4B or 4E.  (*Id.* ¶¶ 15-16.)  Prisoners in CC unit 4A are allowed out one at a time for an hour and can shower during that hour.  (*Id.* ¶ 17.)  Prisoners in Disciplinary Restricted Housing ("Disc. Seg.") are allowed out of their cells one at a time and can shower during their hour out.  (*Id.* ¶ 18.)  When Plaintiff was in Disc. Seg., there were cameras in the showers.  (Pl. Dec. ¶ 8.)  Plaintiff asserts that because he has been in segregated or CC housing where only one inmate is allowed out at a time to shower "the point of video recording [his] shower is unjustified."  (Doc. 82 at 4.)

In order to avoid violating his religious beliefs, Plaintiff has put soap on the camera, placing him in danger of disciplinary actions.  (*Id*. at 4.)  According to Defendant, prisoners with modesty concerns may shower with their boxers on and "use the sink in [their] cell to complete [their] toilet".  (DSOF ¶ 11; Doc. 119 at 7.)  Plaintiff responds that he receives two pairs of boxers each week, but if he uses one pair to shower, he would have wet, moldy boxers because MCSO rules and regulations do not permit hanging clothes in the cell or making a clothes line to dry clothes, and Plaintiff has seen prisoners written up for having laundry lines to dry clothes.  (Pl. Decl. ¶ 12; Doc. 137 at 251 ¶ 11.)  MCSO Rules and Regulations specifically state: "You will not attach strings, pencils, paper, clothing, or any

other object to any part of the bunks, doors, toilets, bars, railings, lights, walls, windows, vents, or tables. Any attached items will be considered contraband and removed from the cell." (Doc. 118-1 at 23.)

Footage from the fixed-view cameras recording the shower areas may only be reviewed in the level supervisor's office for legitimate purposes such as to assist in the investigation of safety or security incidents. (DSOF ¶ 10.) On one occasion, footage from the shower area relating to Plaintiff was reviewed as part of an investigation into why the camera was covered with soap. (*Id.* ¶ 23.) Detention officers reviewed the footage even though the officers knew Plaintiff covered the camera with soap every day and Plaintiff told the officers he had put soap on the camera. (Pl. Decl. ¶ 10.) Detention officers Price and McGill did not ask for a supervisor's permission to view the footage, which they viewed in a supervisor's office. (*Id.* ¶ 13.) A Disciplinary Action Report dated April 28, 2018 indicates that Plaintiff was found guilty of tampering with a security device by placing soap chunks on the camera nearest the shower and was sanctioned with 7 days "Full Restriction." (Doc. 137 at 168.)

In response to a grievance Plaintiff filed about the cameras in the shower, Lt. Ballard wrote on April 26, 2018:

> There are cameras recording the shower areas of the jail since it is the duty of MCSO to provide for the Care, Custody, and Control of the inmates within our jail facilities. . . . These cameras are used for a review purpose only. None of these cameras are monitored, thus eliminating your claim of voyeurism.
>
> As to whether or not MCSO has the authority to have these cameras at all; there are no areas of the jail that the inmates occupy that is not recorded. This is for the safety of the inmates and so that if something were to occur, we could see exactly what happened. There is no intention of any person viewing these cameras for any personal reason, as evident by the fact that they are not viewable by any officer. These cameras are only available to be seen by request for verification reasons of an incident.

(Doc. 120-3 at 5.)

The shower areas in GP or Disc. Seg. may be viewed (apparently live and not later in a recording) when the Tower Officer uses a camera mounted at or near the center of the housing unit, but the default position is not the shower areas. (DSOF ¶ 19.) The camera is capable of rotating 360 degrees and pans, tilts and zooms. (*Id*.) An officer in the Tower can also stand up and see all 4 showers. (Pl. Decl. ¶ 19.)

The Tower Officer is assigned to monitor two housing units, and the officer's duties include monitoring prisoners and staff within those units; communicating with the Floor Officer, Security Control, supervisors, and medical staff; recording operational events and data into the Operations Journal and updating prisoner information; controlling the entering and exiting of the housing units, cells, or recreation areas; monitoring video surveillance cameras in the housing units; answering calls to the housing unit; and helping the Floor Officer in the overall operation of the housing unit. (DSOF ¶¶ 20-21.) Floor Officers conduct security walks and headcounts; supervise prisoners; search prisoners; secure prisoners departing the housing unit; document prisoner exits; distribute forms; review forms submitted by prisoners; respond to emergencies; ensure prisoners are ready for court, medical appointments, etc.; and escort medical staff into and around housing units. (*Id.* ¶ 22.)

During his time in MCSO custody, Plaintiff has not seen or heard of one fight or sexual assault occurring in the shower area, "in fact due to the openness & the tower position inmates don't fight in showers but in one of the 36 cells not equip[p]ed with cameras." (Pl. Decl. ¶ 14.) In response to Plaintiff's request for admissions as to whether MCSO has had "one case of rape in an inmate shower in which an inmate was punished administratively or criminally prosecuted," Defendant stated that "[b]ased on MCSO's PREA records dating back to 2012, [Defendant] admit[s] that no PREA allegations of sexual assault occurring in the showers have been substantiated." (Doc. 137 at 116-117.)

MCSO considered using shower curtains that are clear at the top and bottom and opaque in the center for privacy, but the opaque portion would not provide prisoners with any more privacy because the cameras are mounted close to the ceiling. (DSOF ¶ 24.)

Also, to anchor a track for a shower curtain, the opening of the shower would need to be modified to shorten the gap between the track and curtain. (*Id.*) Where there are shower curtains in other jails, they constantly fall off the track. (*Id.*) Shower curtain rods are not used to hang shower curtains because the rod could be removed and used as a weapon. (*Id.*) Privacy screens are also unsuitable because they can be dismantled and used as a weapon and could create blind spots. (*Id.* ¶ 25.) Swinging shower doors would not provide more privacy and they could be pulled out of the wall and used as weapons. (*Id.* ¶ 26.) MCSO also considered reconstructing the showers into individual stalls, but the cost and disruption to the jail made that unfeasible. (*Id.* ¶ 27.)

The housing units have water fountains, phones, metal fire extinguisher boxes, mounted stools, handicap guard rails, and cameras that Plaintiff "can access if [he] wanted to use [them] as a weapon." (Pl. Decl. ¶¶ 17, 53.) Every housing unit receives cleaning supplies that stay in the housing unit up to 7 hours a day, and MCSO sells bar soap that has been used in socks as weapons. (*Id.* ¶¶ 22-24.) Plaintiff has installed home and business cameras and he believes that one of the cheapest solutions to fix MCSO's show privacy issue is to reposition the existing cameras. (*Id.* ¶ 52.) The Arizona Department of Corrections does not have cameras in the showers and uses shower curtains. (Doc. 82 at 4.)

Although Plaintiff's disciplinary time has expired, he plans to stay in the SMU until he is sentenced, transferred, or released because in SMU he can shower in his cell without a camera and "observe [his] religious tenets daily." (*Id.* at 4-5.)

### B. Facts Relating to Postcard Policy

MCSO currently receives 2,500 to 3,000 pieces of mail daily, including postcards, legal/privileged mail, clergy/religious mail and magazines, books, and photos. The volume increases by 1,000 to 1,500 pieces per day during the holidays. (DSOF ¶ 28.) Every piece of mail is sorted and searched for contraband. (*Id.* ¶ 29.) There are currently 8 Central Mailroom Officers, who take about 45 minutes to sort the mail into categories before inspecting and processing the mail in accordance with the guidelines set for that particular

category of mail. (Doc. 120-5 at 8 (Williams Decl.) ¶¶ 19-21.) Postcards are inspected to ensure they meet MCSO guidelines for Inmate Mail, adhesive stamps and metered stickers are cut off the postcards, and the postcards are placed in the appropriate jail facility bin/tub for delivery. (*Id.* ¶ 22.) Clergy/religious mail is opened and inspected to ensure it does not contain contraband or personal correspondence, packages containing religious books are opened and searched, magazines and publications are searched and each page is inspected to ensure the content does not violate MCSO policy, and legal/privileged mail is searched/sniffed by an MCSO Canine Unit. (*Id.* ¶¶ 23-26.)

Prisoners may send out mail in envelopes and may receive an unlimited number of postcards. (DSOF ¶ 30.) They may also make and receive telephone calls and have video visits. (*Id.* ¶ 31.) There is no way for prisoners to receive phone calls, and during the 9,000 hours Plaintiff has been at the Fourth Avenue Jail, he has only been able to make 47 calls that have connected, for a total of 12 hours of talk time. (Pl. Decl. ¶ 57.)

Until 2007, MCSO had hundreds of incidents of attempts to smuggle contraband into the jail in non-legal mail. (DSOF ¶ 32.) MCSO intercepted drugs hidden on the backside of postage stamps, in the adhesive used to seal envelopes, and even soaked into papers mailed to the jail; other contraband, such as metal pieces, handcuffs keys, and a sawblade were hidden in hollowed-out notepad bindings. (*Id.* ¶ 33.)

In 2007, MCSO adopted the Postcard Policy, which required that all incoming non-legal mail be on 4 x 6 postcards. (*Id.* ¶ 36.) The purpose of the Postcard Policy is to prevent the smuggling of contraband to promote safety, security, and institutional order. (*Id.* ¶ 37.) Stamps and metered stickers are cut off the postcards. (*Id.* ¶ 38.) Since adopting the Postcard Policy, less contraband has entered MCSO jails through non-legal mail by reducing the amount of illegal drugs, weapons material and material that could be used for violence or escape, which has increased overall jail stability and security. (*Id.* ¶¶ 40-41.) Because it takes less time to screen postcards than envelopes, MCSO has been able to devote more of its security staff to jail security assignments rather than screening incoming non-legal mail. (*Id.* ¶ 42.) During his time in MCSO custody, Plaintiff has not seen or

heard of any prisoner receiving drugs or contraband in non-legal mail. (Pl. Decl. ¶ 31.) Also, Plaintiff has received numerous items that MCSO classifies as "contraband of serious nature," including metal clasps, paperclips, staples, binder clips and CDs "sent yet returned in legal mail as well." (*Id.* ¶ 32.)

The Jail Intelligence Division monitors non-legal telephone calls, and Intelligence Officers have intercepted telephone calls by prisoners discussing how to hide papers dipped/sprayed with narcotics within the pages of non-legal mail disguised as legal mail. (DSOF ¶ 43.) If MCSO returned to allowing non-legal mail in envelopes, it would likely re-open a smuggling channel that is currently closed and would increase the workload of mailroom staff because each envelope and piece of paper inside the envelope would have to be thoroughly searched and scrutinized. (*Id.* ¶¶ 43-44.)

MCSO has Canine Units that are used by MCSO for law enforcement or detention purposes and there is no Canine Unit assigned specifically to the mailroom. (DSOF ¶¶ 45-46.) Mailroom staff manually inspect very piece of non-legal mail and must wait for the canine to search the legal mail. (*Id.* ¶ 46.) The canine does not arrive at the same time each day, and legal mail is not processed and delivered until the canine arrives to search the mail. (*Id.* ¶ 47.) It would disrupt the operations of the Central Mailroom to use a canine to search non-legal mail because the canine's schedule is unpredictable, would affect the scheduling of Central Mailroom Officers and the time in which the Central Mailroom can process and deliver non-legal mail, and could interfere with the Central Mailroom's compliance with the MCSO policy of delivering prisoner mail to jail facilities within 24 hours of receipt. (*Id.* ¶ 48.) A non-trained canine costs approximately $12,500, with an additional $26,000 in equipment costs for each canine and handler team, as well as the salary and benefits for a Detention Canine Handler. (*Id.* ¶ 49.)

During Plaintiff's time in MCSO custody, he has received 104 postcards. (Pl. Decl. ¶ 26.) Family and friends have told Plaintiff that the limited space on the postcards, lack of privacy, and the cost of getting numerous postcards is why they don't write. (*Id.* ¶ 27.) Plaintiff values all correspondence from his family and friends and re-reads his postcards

often.  (*Id.* ¶ 39.)  Plaintiff can only send postcards when he is indigent, which has happened for months at a time while he has been in MCSO custody.  (*Id.* ¶ 56.)  Plaintiff has sent Captain Spurgin four Inmate Requests for authorization to receive non-postcard, non-legal mail, and his requests have either been ignored or a sergeant responded.[3]  (*Id.* ¶ 44.)  Plaintiff has received non-legal mail that is not on postcards from groups, even though MCSO rules say that "is not permitted."  (*Id.* ¶ 42.)

Plaintiff has never been in a jail or prison with a similar postcards-only policy and he is not aware of any other jail or prison in Arizona that has such a policy.  (*Id.* ¶ 38.)  Plaintiff has been told that postcards "are the least items" received each day and that 95% of the mail is legal mail, newspapers, and other bulk mail.  (*Id.* ¶ 54.)

### C.  Facts Relating to Photographs Policy

A prisoner may have up to 5 photographs in their possession; photographs must be no larger than 4 x 6 inches, unaltered, and contain no adhesives.  (DSOF ¶¶ 50, 53.)  MCSO set the limit at 5 photographs based on the volume of incoming mail that must be processed, the amount of time it takes to process photographs (i.e., screening for prohibited content and tracking the number of photographs a detainee already has), and "the potential for photographs to be abused" if there were no limit.  (*Id*. ¶ 51.)  The policy also helps with promoting institutional order and safety by limiting the amount of property that has to be searched during cell searches, limiting the amount of property to be moved during cell moves, and keeping cells clean and orderly.  (*Id*.)  Prisoners may release photographs in their possession to make room for new photographs.  (*Id.* ¶ 52.)

MCSO's rules do not explain how to exchange photos, and Plaintiff does not have the funds to purchase envelopes to send out photos to make room to receive others.  (Pl. Decl. ¶ 36.)  Plaintiff has talked to other prisoners who did not know they could swap out photos.  (*Id.* ¶ 66.)  Not being able to receive photos depresses Plaintiff.  (*Id.* ¶ 65.)  98% of Plaintiff's postcards have photos on them, that are not of family or friends.  (*Id.* ¶ 28.)  Plaintiff has cut photos out of magazines and newspapers because they sometimes resemble

---

[3] Plaintiff does not say what the sergeant said in response to his requests.

a family member or friend or are of his favorite teams and players, and having the photos allows him to not feel imprisoned.  (*Id.* ¶ 65.)

MCSO processes approximately 300 to 350 photographs a day.  (DSOF ¶ 54.)  Each envelope is inspected and opened, and the photographs are inspected to ensure they do not contain contraband or depict restricted subject matter such as gang information, sexual conduct, nudity, or weapons.  (*Id.* ¶ 55.)  It takes, on average, 5 minutes to process one envelope of photographs.  (*Id.* ¶ 56.)  Plaintiff received 240 color, full-page evidence photos while he was in SMU 1 housing, and it took a detention officer 5 to 7 minutes to screen them.  (Pl. Decl. ¶ 60.)  Plaintiff has received photos of weaponry, drugs, and alcohol in newspapers and in his criminal case disclosures.  (*Id.* ¶ 47.)

Prisoners tend to value photographs more than their other property, and officers who have damaged or removed photographs have been assaulted and have had to call for backup to de-escalate tensions when an officer has damaged or removed photographs from a prisoner's possession.  (DSOF ¶¶ 57-59.)  During his time in MCSO custody, Plaintiff has "not seen one incident where an inmate either assaulted staff or extra staff were summoned over inmate pictures."  (Pl. Decl. ¶ 33.)

For over a year, Plaintiff has had 3 banker boxes, 13 brown large bags, 240 newspapers, miscellaneous paperwork and manila envelopes in his property.[4]  (*Id.* ¶ 34.)  Plaintiff's cell has been searched multiple times and he has been re-housed numerous times; when Plaintiff asked MCSO officers if it is complicated or difficult to search or move him, he was told "it's just a job & the cart does all the work (where I load my property to be moved on)."  (*Id.* ¶ 43.)

**IV.  Discussion**

      **A.  Shower Claim**

---

[4] Plaintiff states that his investigator has photos of his cell showing his property, which MCSO has refused to allow Plaintiff to have.  (Pl. Decl. ¶ 69.)  Those photographs taken by his investigator are the subject of Plaintiff's Motion for Leave to Have his Investigator Lodge Photos of His Cell and to Request Order Issue to Enjoin MCSO from Interfering in Plaintiff's Criminal and Federal Suits (Doc. 135), which the Court addresses later in this Order.

Plaintiff claims that the cameras in the shower areas of MCSO jails violate his rights under RLUIPA and the First Amendment.

### 1. RLUIPA

#### a) Legal Standard

"RLUIPA protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,' but, of course, a prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation." *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (quoting § 2000cc–5(7)(A)). Under its own terms, RLUIPA must be "construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (citing 42 U.S.C. § 2000cc-3(g)).

RLUIPA requires an inmate to show that the relevant exercise of religion is grounded in a sincerely held religious belief. *Holt*, 135 S. Ct. at 862. Next, the inmate bears the burden of establishing that a prison policy constitutes a substantial burden on that exercise of religion. *Id.*; *Warsoldier*, 418 F.3d at 994 (citing 42 U.S.C. § 2000cc-2(b)). RLUIPA provides greater protection than the First Amendment's alternative means test. *Holt*, 135 S. Ct. at 862. If the inmate makes the initial showing, the burden shifts to the government to prove that the substantial burden on the inmate's religious practice both furthers a compelling governmental interest and is the least restrictive means of doing so. *Warsoldier*, 418 F.3d at 995.

#### b) Analysis

Defendant does not dispute that Plaintiff's religious beliefs are sincerely held. Therefore, the Court will examine first whether MCSO's placement of cameras in the showers substantially burdens Plaintiff's sincerely held beliefs.

A substantial burden exists where the state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Ind. Employment Sec. Div.,* 450 U.S. 707, 717-18 (1981). A substantial burden must be more than an inconvenience." *Worldwide Church of God v. Philadelphia Church of God,*

*Inc.*, 227 F.3d 1110, 1121 (9th Cir. 2000) (internal quotes and citations omitted).

Plaintiff has not demonstrated that the placement of the shower cameras creates more than an inconvenience on his religious beliefs. Each inmate is provided two pairs of boxers each week, one of which may be used as shower shorts. Thus, Plaintiff is not forced to shower in the nude. Moreover, as Plaintiff has done in the past, he may cleanse himself in his cell sink where he is free from view of any video recordings.

Plaintiff claims there is a prison policy that prohibits him from hang drying his boxers. Thus, to maintain his modesty and his religious beliefs Plaintiff may have to wear wet boxers during his showers. This circumstance may be an inconvenience, but it is not such a burden that it puts substantial pressure on Plaintiff to violate his beliefs. Moreover, Plaintiff has not provided evidence that he has been denied a request for an additional pair of boxers, or that the boxers cannot be dried in a permissible fashion.

Because Plaintiff has not shown that a prison policy or practice places a substantial burden on his religious beliefs, Plaintiff's RLUIPA claim fails. The Court need not consider whether the policy furthers a compelling government interest or is the least restrictive means of doing so. Defendant's motion for summary judgment with respect to Plaintiff's RLUIPA claim in Count One is granted.

### 2. First Amendment

#### a) Legal Standard

"Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion.'" *Shakur v Schriro*, 514 F.3d 878, 883–84 (9th Cir. 2008) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)). To implicate the Free Exercise Clause, a prisoner must show that the belief at issue is both "sincerely held" and "rooted in religious belief." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994); *see Shakur*, 514 F.3d 884–85 (noting the Supreme Court's disapproval of the centrality test and finding that the sincerity test in *Malik* determines whether the Free Exercise Clause applies). If the prisoner makes this initial showing, he must then establish that prison officials substantially burden the practice of his religion by

preventing him from engaging in conduct which he sincerely believes is consistent with his faith. *Shakur*, 514 F.3d at 884–85. A regulation that burdens an inmate's First Amendment rights may be upheld only if it is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987). This determination requires analysis of four prongs: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) the impact accommodation of the right will have on guards and other inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives. *Id.* at 90. The "existence of obvious, easy alternatives" to the regulation indicate that it "is an exaggerated response to prison concerns." *Id.* (citation and quotation omitted).

### b) Analysis

The Court has already determined that Plaintiff has not demonstrated a genuine dispute with respect to whether the placement of the shower cameras substantially burdens the exercise of Plaintiff's religion. *See Sprouse v. Ryan*, 346 F. Supp. 3d 1347, 1357 (D. Ariz. 2017) ("The RLUIPA substantial-burden test is the same as that used under the First Amendment."). Because Plaintiff has not met his burden, summary judgment will be granted as to Plaintiff's First Amendment claim in Count One and the Court need not consider whether the regulation is reasonably related to a legitimate penological interest.

### B. Postcard Policy

A prisoner retains First Amendment rights not inconsistent with his status as a prisoner and with legitimate penological objectives of the corrections system. *See Shaw v. Murphy*, 532 U.S. 223, 231 (2001); *Clement v. California Dep't of Corrs.*, 364 F.3d 1148, 1151 (9th Cir. 2004). Thus, an inmate has a First Amendment right to receive mail; however, that "right is subject to 'substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security.'" *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005); *Morrison v. Hall*, 261 F.3d 896 (9th Cir. 2001); *Prison Legal News v. Cook*, 238 F.3d 1145 (9th Cir.

2001).  Jails and prisons may regulate the processing of inmate mail so long as those regulations further an important or substantial government interest other than the suppression of expression.  *See Procunier v. Martinez*, 416 U.S. 396, 411–12 (1974), *overruled on other grounds, Thornburgh v. Abbott*, 490 U.S. 401, 412–414 (1989)); *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002) (jail personnel may regulate speech if a restriction is reasonably related to legitimate penological interests and an inmate is not deprived of all means of expression).  "Prevention of criminal activity and the maintenance of prison security are legitimate penological interests which justify the regulation of both incoming and outgoing prisoner mail."  *O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9th Cir. 1996).

In *Covell v. Arpaio*, 662 F. Supp. 2d 1146, 1153 (D. Ariz. 2009), the Court found that MCSO's postcard-only policy for incoming non-legal mail had a rational connection to legitimate governmental interests to prevent or limit the smuggling of contraband—such as drugs, handcuff keys, and weapons—into the jails via incoming mail, particularly in light of the thousands of pieces of mail subject to inspection each day.  Other cases have reached similar conclusions concerning the postcard policy.  *See Gieck v. Arpaio*, No. CV07-1143-PHX-NVW, 2008 WL 2604919, at *4–8 (D. Ariz. June 23, 2008) (rejecting facial challenge to policy but noting that a "real case with real facts or a different challenge of the context and justification of the mail policy with supporting evidence, would demand a fresh look"); *Gamble v. Arpaio*, No. CV12-790-PHX-GMS (LOA), 2013 WL 5890730, at *2, *3, *4 (D. Ariz. Nov. 4, 2013) (rejecting the plaintiff's challenge to the MCSO policy restricting incoming mail to postcards in light of undisputed evidence that the plaintiff had alternative options for communicating with his business associates through phone calls, jail visits, his attorney, or requesting the jail commander to authorize non-postcard items or packages).

Likewise, here, Defendant's postcard-only policy satisfies the *Turner* factors.  Defendant's evidence that the Postcard Policy is to eliminate an avenue for contraband and drugs coming into the jail is rationally related to the jail's legitimate penological interest

of safety and security. Defendant has presented evidence that Plaintiff has alternative means of communicating with family and friends by sending out letters in envelopes and through telephone calls and video visits. As to the third *Turner* factor, Defendant presents evidence that allowing non-legal mail in envelopes would possibly re-open a smuggling channel that is currently closed and would increase the workload of mailroom staff because each envelope and piece of paper inside the envelope would have to be thoroughly searched and scrutinized.

The final prong of the *Turner* analysis requires Plaintiff to show that there are obvious, easy alternatives to the postcard-only policy. Plaintiff proposes that MCSO photocopy all enveloped non-legal mail and deliver the photocopies to the inmates. Plaintiff points out that MCSO currently photocopies the envelopes containing photos, and he proposes that MCSO limit non-legal mail to prisoners to two pages and ban notepads. (*See* Doc. 137 at 260 ¶ 44.) But Plaintiff has not shown that his alternatives would result in de minimis cost to MCSO. Accepting as true Plaintiff's contention that only 5% of the mail received consists of postcards to prisoners and assuming that percentage would remain the same if MCSO returned to allowing non-legal mail in envelopes, this would still result in 125 to 150 pieces of mail each day, or up to 225 pieces during the holidays, that would need to be inspected and photocopied, and Plaintiff has not shown that such efforts would be a de minimis cost to MCSO. Plaintiff has also suggested that a canine unit be used to search non-legal mail, but the evidence supports that the addition of even one canine unit would not be a de minimis cost.

Based on this record, there is no genuine issue of material fact that the postcard policy violates Plaintiff's First Amendment rights and Defendant is entitled to summary judgment as to the Postcard Policy claim in Count Two.

### C. Photographs Policy

Defendant asserts that the limitation on the number of photographs a prisoner may possess promotes efficient cell searches, makes it easier to move prisoners, promotes the general orderliness of cells, and limits reprisals from damaged property, particularly

damaged photographs, which are valued more highly than other property. (Doc. 119 at 14.) Plaintiff, though, presents evidence that prisoners may have an unlimited number of postcards with photos on them, that he collects photos from newspapers and magazines, and he received 240 full-page evidence photos, which took MCSO officers 5 to 7 minutes to search and screen.

Based on this evidence, there is a question of fact whether MCSO's limit of 5 photographs is rationally related to the jail's legitimate penological interest in maintaining order and workloads. Moreover, it is unclear how MCSO settled on the limit of 5 photographs, as opposed to some other number, which presents the possibility that the number is arbitrary and not rationally related to the jail's legitimate penological interest. *See Prison Legal News*, 238 F.3d at 1150 (if the prisoner refutes prison administrators' "common sense connection" between the regulation and its stated objectives, then the prison administrators must demonstrate that the relationship is not so "remote as to render the policy arbitrary or irrational") (citation and quotation omitted).

Because Defendant has not shown that the limit on the number of photographs is rationally related to a legitimate penological objective, the Court does not need to consider the other *Turner* factors. *Prison Legal News*, 238 F.3d at 1151. Accordingly, the Court will deny summary judgment to Defendant on Plaintiff's claim regarding the limitation on personal photos in Count Two.

## V. Motions for Injunctive Relief

Plaintiff has filed two motions seeking injunctive relief. (Docs. 118, 135.)

### A. Legal Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). A plaintiff seeking a preliminary injunction must show that

(1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this serious questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

Regardless of which standard applies, the movant "has the burden of proof on each element of the test." *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000). Further, there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction, which should not be granted "unless the facts and law clearly favor the plaintiff." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986) (citation omitted).

The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

## B. Discussion

In the first motion, Plaintiff seeks an injunction authorizing him to receive First Class mail and unlimited photos while he is incarcerated by MCSO. (Doc. 118.) Plaintiff states in a Declaration that his freedom of expression is severely limited by MCSO policies that only allow him to receive 4 x 6 inch postcards and to only possess 5 photographs at a time. (*Id*. at 5 ¶ 2.) He further states that he faces irreparable harm "in the form of

prolonged suppression of [his] expression by . . . severely limiting [his] communications from society, friends, & family." (*Id.* ¶ 4.)

The Court is granting summary judgment to Defendant with respect to the Postcard Policy. Thus, Plaintiff cannot show a likelihood of success on the merits as to that policy and the Court will deny this request for injunctive relief. As to the request for unlimited photographs, there are serious questions going to the merits of this claim, but, in balancing the equities, the Court will not enjoin this policy until it is found to be unconstitutional because of the burden it would impose on Defendant and because Plaintiff has not shown irreparable harm from a delay that would result between now and when a trial could be held.

In his second motion, which the Court construes as a motion for injunctive relief, Plaintiff states that he filed a motion in his state court criminal case seeking to enjoin MCSO from limiting his incoming mail to postcards and to stop recording his phone calls to witnesses. (Doc. 135 at 1.) Plaintiff had his investigator take photographs of his cell to show that MCSO's postcard policy was "over exaggerated." (*Id.* at 2.) When MCSO staff saw the photos, they denied entry to Plaintiff's investigator, told him to leave, and said they would be investigating. (*Id.*) Plaintiff states that because he represents himself, "he is permitted to gather evidence to defend & present his case in chief." (*Id.*) Plaintiff seeks an order allowing the photos taken by his investigator and his investigator's memo be lodged as exhibits in this matter to support his Response to Defendant's Motion for Summary Judgment, to have the Court enjoin "MCSO from interfering with Plaintiff's case," and to not ostracize his investigator for doing his job. (*Id.* at 3-4.)

Plaintiff is not entitled to injunctive relief on this second motion. First, it is not sufficiently clear what specific relief the Plaintiff seeks by the presumptive order that would prevent "MCSO from interfering with Plaintiff's case." Further, and in any event, the allegations in this new motion for preliminary injunction arise from events distinct from his RLUIPA and First Amendment claims that are currently before the Court. New claims may not be presented in a motion for injunctive relief and must be brought in a separate

action.  *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."); *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam) (a party seeking injunctive relief must establish a relationship between the claimed injury and the conduct asserted in the complaint).

Second, even if the Court construes Plaintiff's allegations in the motion as an access-to-courts claim, Plaintiff's request for injunctive relief still fails.  To maintain an access-to-courts claim, a prisoner must submit evidence showing an "actual injury" resulting from the defendant's actions.  *Lewis v. Casey*, 518 U.S. 343, 349 (1996).  With respect to an existing case, the actual injury must be "actual prejudice . . . such as the inability to meet a filing deadline or to present a claim."  *Id*. at 348–49.  Plaintiff has failed to show a likelihood of success on the merits or irreparable injury as it pertains to an access-to-courts claim.  There is no evidence that Plaintiff has been unable to meet a filing deadline or to present a claim.  A review of the docket in this matter reflects that Plaintiff has filed numerous motions with the Court.  Plaintiff has not shown that his ability to litigate this case has been impeded.  Plaintiff has not been prevented from bringing a claim as a result of the alleged conduct.  Moreover, the photographic evidence the Plaintiff seeks to file in support of his Response to the Motion for Summary Judgment is unnecessary because Plaintiff described the contents of his cell, which the Court has taken as true in deciding the Motion.  Thus, Plaintiff has not established actual injury.  Plaintiff has also failed to satisfy the remaining requirements that must be shown to warrant injunctive relief.  *See Winter*, 555 U.S. at 20.  For the foregoing reasons, the Court will deny Plaintiff's second motion for injunctive relief.

## VI.    Defendant's Motion to Strike

In this motion, Defendant seeks to strike exhibits that Plaintiff attached to his Reply in support of his Motion for Preliminary Injunction.  (Doc. 143.)  Because the Court did

not consider those exhibits in deciding Plaintiff's Motion for Preliminary Injunction, which it will deny, the Court will deny Defendant's Motion to Strike as moot.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendant Penzone's Motion for Summary Judgment (Doc. 119), Plaintiff's "Motion for Preliminary Injunction & or Declaratory Judgment In Lieu of & Request for Leave to Add Pages & All Attached Exhibits Per LRCiv. 7.2(e)" (Doc. 118), Plaintiff's "Motion for Leave to Have His Investigator Lodge Photos of His Cell & to Request Order Issue to Enjoin MCSO from Interfering in Plaintiff's Criminal & Federal Suits" (Doc. 135), which the Court construes as a motion for preliminary injunction, and Defendant Penzone's Motion to Strike (Doc. 143).

(2)     Defendant Penzone's Motion for Summary Judgment (Doc. 119) is **GRANTED in part and DENIED in part**.  The Motion is **GRANTED** as to MCSO's policies regarding postcards and cameras in the showers and **DENIED** as to MCSO's policy limiting an inmate's possession of photographs.

(3)     Plaintiff's "Motion for Preliminary Injunction & or Declaratory Judgment In Lieu of & Request for Leave to Add Pages & All Attached Exhibits Per LRCiv. 7.2(e)" (Doc. 118) and Plaintiff's "Motion for Leave to Have His Investigator Lodge Photos of His Cell & to Request Order Issue to Enjoin MCSO from Interfering in Plaintiff's Criminal & Federal Suits" (Doc. 135) are **DENIED**.

(4)     Defendant Penzone's Motion to Strike (Doc. 143) is **DENIED as moot**.

(5)     Plaintiff's "Stipulated Motion to Withdraw Defendant's Captains Jesse Spurgin and Scott Vail" (Doc. 176) is **GRANTED**.

(6)     The Clerk of court is directed to dismiss the claims against Defendant Jesse Spurgin and Scott Vail without prejudice.  Each party to bear their own attorney's fees and costs.

(7)     This matter is referred to Magistrate Judge John Z. Boyle for a settlement conference.

(8)     Defense Counsel shall arrange for the relevant parties to jointly call Magistrate Judge Boyle's chambers at (602) 322-7670 within 14 days to schedule a date for the settlement conference.

Dated this 5th day of February, 2020.

G. Murray Snow
Chief United States District Judge